**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

IMHOTEP SA'RA,

 Petitioner-Appellant,

v.

RICK RAEMISCH, Executive Director,
Colorado Department of Corrections;[*]
PAMELA PLOUGHE, Warden, Colorado
Territorial Correctional Facility; JOHN
SUTHERS, Attorney General, State of
Colorado,

 Respondents-Appellees.

No. 12-1362
(D.C. No. 1:11-CV-03255-RPM)
(D. Colo.)

**ORDER AND JUDGMENT**[**]

Before **HOLMES**, **HOLLOWAY**, and **BACHARACH**, Circuit Judges.

 Mr. Imhotep Sa'Ra was convicted in Colorado state court of sexual assault,

false imprisonment, first-degree criminal trespass, and third-degree assault on his

wife, Ms. Lori McVea. In an application for post-conviction relief, Sa'Ra argued

that his attorney had provided ineffective assistance by failing to investigate and call

---

[*] In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure,
Rick Raemisch is substituted for Roger Werholtz as a respondent-appellee in this
action.

[**] This order and judgment does not constitute precedent. *See* 10th Cir. R.
32.1(A).

a particular witness at trial.  The court denied relief, and Sa'Ra filed a federal habeas petition in district court.  Again unsuccessful, he appeals the ruling on his ineffective-assistance claim.  The federal district court held that the legal representation was deficient, but was not prejudicial.  We affirm, but disagree with the district court's conclusion that the legal representation had been deficient.  We hold:

- The state appellate court reasonably determined that Sa'Ra's trial attorney had not performed deficiently; and

- even if the legal representation had been deficient, the alleged omissions would not have been prejudicial.

## BACKGROUND

In addressing the ineffective-assistance claims, we begin with the background. The pertinent background consists of:

- what took place at trial and in the direct appeal,

- the evidence presented in state post-conviction proceedings, and

- what took place in the federal habeas proceedings.

## I.     The Trial and the Direct Appeal

McVea testified that Sa'Ra had entered her apartment and forcibly raped her when she refused to have sex.  Afterward, Sa'Ra left and McVea called 911.  The responding officer testified that when he arrived, McVea was hysterical, crying, and saying she had been raped.

She was taken to a hospital, where she was examined. The physician doing the examination testified that McVea "had a small contusion or a bruise to the right side of her nose, she had a small abrasion or scrape to her left knee, and she had a small tear in the skin just below her vagina" that could have been caused by "vigorous consensual sex," "vigorous nonconsensual sex," or "lack of lubrication prior to intercourse." Aplt. Appendix, Vol. I at 78, 90. During the examination, medical personnel took DNA samples that forensic experts later matched with Sa'Ra's.

Sa'Ra's defense theory was that he maintained a consensual sexual relationship with McVea while they were estranged and that McVea was jealous because Sa'Ra was seeing another woman (Ms. Renee Singleton). In support of that theory, Sa'Ra's sister, Ms. Cheryl Turner, testified that: (1) the night after the alleged rape, she witnessed Sa'Ra and McVea having sex; (2) Sa'Ra had angered McVea by dating Singleton; and (3) McVea had "expressed . . . that if she couldn't have [Sa'Ra], nobody else gonna have him" and "[s]he'd see him in jail." *Id.*, Vol. II at 366. Singleton testified that McVea had also said "that no one [was] going to have [Sa'Ra] if she couldn't have him" and that "she was gonna do something to [Sa'Ra]." *Id.* at 393, 395.

Sa'Ra was convicted based on a guilty verdict. The Colorado Court of Appeals affirmed, and the Colorado Supreme Court denied certiorari.

**II.     The State Post-Conviction Proceedings and the Scope of Hoskins's Testimony**

Sa'Ra filed a motion for post-conviction relief under Colorado Rule of Criminal Procedure 35(c). He argued that his attorney, Ms. Dana Casper, had been ineffective by failing to investigate and call Janice Hoskins as a witness. Hoskins had raised McVea and claimed to have information that McVea had: (1) lied about the extent of her contacts with Sa'Ra from November 2000 to January 2001, and (2) fabricated the rape charge to punish Sa'Ra for his affair with Singleton. At the hearing, Hoskins, Sa'Ra, and Casper testified regarding: (1) disagreements with McVea about what she had said at trial, (2) an admission by McVea, and (3) defense counsel's pretrial investigation and reasons for not calling Hoskins as a witness at trial.

   A.    Testimony Questioning McVea's Testimony

The testimony at the post-conviction hearing contradicted parts of McVea's trial testimony.

For example, at the trial, McVea testified that she had seen Sa'Ra only "around Christmastime." *Id.*, Vol. I at 71. Hoskins disputed this version, testifying at the post-conviction hearing that she had "[c]onstantly" seen McVea with Sa'Ra "from November 2000 through the time of Sa'Ra's arrest." *Id.*, Vol. III at 530.

And, both Hoskins and Sa'Ra testified at the post-conviction hearing that McVea had made damaging admissions. For example, Hoskins testified that McVea had admitted that "she never was raped." *Id.* at 525. Sa'Ra added in the hearing that

- 4 -

McVea had promised in a three-way conference call that she would drop the charges if he ended the relationship with Singleton. *Id.* at 574.

B.    Testimony About Casper's Investigation

The post-conviction hearing covered not only questions about McVea's trial testimony, but also the extent of Casper's pretrial investigation.

For example, Casper testified that her file contained:  (1) "a specific notation to Janice Hoskins," and (2) information about the three-way telephone call between Sa'Ra, Hoskins, and McVea. *Id.* at 543, 552-53.

The testimony also covered Casper's recollection.  Casper was positive that her investigator had spoken with Hoskins.  Though Casper could not remember why she had chosen not to use Hoskins, Casper thought "that [Hoskins] must have had something negative to say, or [she] would have called [Hoskins] as a witness." *Id.* at 547.

C.    The State-Court Decisions

The state district court denied Sa'Ra's Rule 35(c) motion, and the Colorado Court of Appeals affirmed.  In affirming, the appeals court reasoned that Casper had made a tactical decision not to call Hoskins as a witness:

> Both [Hoskins] and trial counsel were unsure whether and how much contact they had had with one another.  However, counsel had written in her trial preparation notes that [Sa'Ra] had told her about [Hoskins] and the three-way phone call.  The [post-conviction] court had the discretion to credit counsel's testimony that she had investigated whether to call [Hoskins] as a witness and to conclude that counsel's decision not to call [Hoskins] was reasonable because her testimony would not have helped [Sa'Ra].

*Id.* at 625.

## III. The Federal Habeas Proceedings

The federal district court disagreed with the Colorado Court of Appeals, determining that Casper had performed deficiently in her investigation of Hoskins as a potential witness. Nevertheless, the district court concluded that the deficient performance had not prejudiced Sa'Ra's defense. Thus, the district court denied habeas relief.

### THE INEFFECTIVE-ASSISTANCE CLAIMS

Sa'Ra claims that Casper rendered ineffective assistance of counsel in investigating Hoskins as a potential witness and then not calling her to testify. This claim requires a showing of both deficient representation and prejudice. *Black v. Workman*, 682 F.3d 880, 902 (10th Cir. 2012). Sa'Ra has not satisfied either element.

## I. Deficiency

In considering the adequacy of the legal representation, we engage in a "highly deferential" review. *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (internal quotation marks omitted). In exercising this deference, we presume that the attorney provided adequate assistance and used reasonable judgment in all the significant decisions. *Id.*

For ineffective-assistance claims decided on the merits in state court, the Antiterrorism and Effective Death Penalty Act of 1996 confines our review. *See*

*Littlejohn v. Trammell*, 704 F.3d 817, 824 (10th Cir. 2013). Under this Act, we consider whether the state court's decision on legal issues was contrary to, or an unreasonable application of, clearly-established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Thus, we can grant habeas relief only if the state court applied the law in an objectively unreasonable fashion. *DeRosa v. Workman*, 679 F.3d 1196, 1207 (10th Cir. 2012).

This burden is not easily met. *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). Indeed, when the Antiterrorism and Effective Death Penalty Act controls, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument" that counsel had employed a justifiable strategy. *Id.* Applying this principle, the Supreme Court has held that courts cannot require proof that counsel had actually followed a given strategy if it would have been objectively reasonable:

> The Court of Appeals erred in dismissing strategic considerations like these as an inaccurate account of counsel's actual thinking. Although courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Id.* at 790 (citations omitted).

It was reasonable for the Colorado Court of Appeals to conclude that Casper did not perform deficiently.[1] This conclusion could legitimately have been based on inferences that Casper had known that Hoskins was a potential witness, had talked to Hoskins before the trial, and had an investigator talk to Hoskins.

While Casper could not remember why she had decided against using Hoskins at trial, Casper cited the general practice of not calling witnesses harmful to one's own client. Given that calling Hoskins as a witness might have revealed Sa'Ra's incarceration on an unrelated charge and that Sa'Ra had violated institutional rules against three-way calls, Casper may have been justified in not calling Hoskins as a witness.

Casper may or may not have applied this reasoning when she decided on her witnesses. But Casper's actual thinking on the subject does not matter because the test is objective, rather than subjective. The potential harm to Sa'Ra's defense would have provided a reasonable basis for Casper to decide against calling Hoskins as a witness. Thus, the state appellate court acted reasonably when it concluded that Casper had not acted deficiently.

---

[1]     Sa'Ra argues that the district court's deficiency determination is binding on appeal because the Respondents did not cross-appeal. But "[a]n appellee may, without filing a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court." *Ute Distrib. Corp. v. Sec'y of Interior*, 584 F.3d 1275, 1282 (10th Cir. 2009) (internal quotation marks omitted).

## II.    Prejudice

Even if Casper had performed deficiently, Sa'Ra has not demonstrated prejudice.

The prejudice prong requires an applicant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Because the Colorado Court of Appeals did not address the element of prejudice, we exercise our independent judgment. *See Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013). Our independent judgment is affected by allocation of the underlying burden of persuasion. That burden falls on the Petitioner, who must show a constitutional violation by a preponderance of the evidence. *See Beeler v. Crouse*, 332 F.2d 783, 783 (10th Cir. 1964) (per curiam) ("Habeas corpus is a civil proceeding and the burden is upon the petitioner to show by a preponderance of the evidence that he is entitled to relief." (citation omitted)).

According to Sa'Ra, the outcome would likely have been different if the jury had heard Hoskins testify. Sa'Ra points to Hoskins's statement that McVea admitted she had fabricated the rape allegation out of jealousy. According to Sa'Ra, the absence of Hoskins's testimony was prejudicial because the jury was initially deadlocked and "the only forensic evidence was ambiguous." Aplt. Opening Br. at 24. Sa'Ra has not shown by a preponderance of the evidence that a different outcome would have been reasonably probable if Hoskins had testified at trial. There

are two reasons: (1) Hoskins's account was largely cumulative of others' trial testimony; and (2) the prosecution's evidence would have remained equally strong.

Sa'Ra's argument on prejudice is undercut by the fact that others had already testified at trial about two of the subjects that Hoskins could have addressed: (1) McVea's statement that she would punish Sa'Ra; and (2) the frequency with which McVea had seen Sa'Ra after their breakup. For example, Turner and Singleton testified that McVea had said she would punish Sa'Ra if she (McVea) could not have him. Turner also testified that McVea had said she would "see him in jail." Aplt. Appendix, Vol. II at 366. And another witness, Ms. Tamica Alexander, testified that McVea had said that "if she could not have Sa'Ra, she would see to it that no one could have him." *Id.* at 378.

Although Hoskins could have impeached McVea's account of how often Sa'Ra and McVea had been together after their breakup, McVea admitted that she was with Sa'Ra at Christmas and several days earlier. *Id.*, Vol. I at 135, 164, 228. McVea's trial testimony was also undercut by Turner, who testified that she had seen Sa'Ra and McVea having sex after the two had purportedly broken up. *Id.*, Vol. II at 358-61.

With the testimony by Turner, Singleton, and McVea already before the jury, we believe Hoskins's testimony would have added relatively little to the strength of Sa'Ra's defense.

- 10 -

At the same time, the State's theory would have remained roughly as strong even if Hoskins had testified at trial. The jury still would have had to weigh Sa'Ra's defense theory against McVea's testimony about the rape and the corroboration that when an officer arrived, she was hysterical, saying she had been raped.

In light of the strength of the prosecution's evidence and the duplicative nature of Hoskins's testimony, we do not believe Sa'Ra has shown by a preponderance of the evidence that a different outcome would have been reasonably probable if Casper had called Hoskins at trial. Thus, we hold that Sa'Ra has not shown prejudice.

## CONCLUSION

We affirm the district court's denial of habeas relief because the legal representation was neither deficient nor prejudicial.

Entered for the Court


Robert E. Bacharach
Circuit Judge