FILED
United States Court of Appeals
Tenth Circuit

May 15, 2019

Elisabeth A. Shumaker
Clerk of Court

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

KEVIN DEWITT SKAGGS,

Petitioner - Appellant,

v.

RON BAKER,* Warden, Lansing
Correctional Facility; DEREK SCHMIDT,
Attorney General of Kansas,

Respondents - Appellees.

No. 18-3202
(D.C. No. 5:16-CV-03081-JAR)
(D. Kansas)

## ORDER AND JUDGMENT**

Before **HARTZ**, **McHUGH**, and **CARSON**, Circuit Judges.

Mr. Kevin Skaggs, proceeding pro se,[1] appeals the district court's denial of a

writ of habeas corpus under 28 U.S.C. § 2254 of the Antiterrorism and Effective

---

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Ron Baker, current
Warden of the Lansing Correctional Facility, is automatically substituted for Sam
Cline as Respondent in this case.

\*\* This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and
Tenth Circuit Rule 32.1.

[1] Because Mr. Skaggs is pro se, "we liberally construe his filings, but we will
not act as his advocate." *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).

Death Penalty Act ("AEDPA"). For the reasons stated below, we affirm the district court's denial.

## I.    BACKGROUND

Mr. Skaggs was convicted in Kansas state court of three counts of rape, one count of aggravated criminal sodomy, two counts of sexual exploitation of a child, and one count of promoting obscenity to minors. After exhausting his direct appeals and state post-conviction proceedings, he petitioned for a writ of habeas corpus in federal district court under 28 U.S.C. § 2254. When considering a petition for habeas relief under § 2254, we defer to the state court's fact findings, presuming the state court's factual determinations to be correct unless the petitioner can rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Malone v. Carpenter*, 911 F.3d 1022, 1029 (10th Cir. 2018). Because Mr. Skaggs does not attempt to rebut that presumption, we are limited to the facts as found by the state court. We therefore reproduce the following summation of the facts in this case:

> B.S., an 11-year-old girl, testified she was sexually assaulted on several occasions when she stayed overnight with [Mr.] Skaggs during a 2-month period from November 21, 2004 through January 21, 2005. According to B.S., [Mr.] Skaggs penetrated her vagina with his fingers and penis and had her engage in oral sex. A subsequent medical examination of B.S. "was consistent with sexual abuse or assault." At trial, [Mr.] Skaggs denied the allegations and only admitted to giving B.S. a back rub on his bed and then sleeping with her.
>
> Evidence from [Mr.] Skaggs' computer demonstrated numerous forays into child sexual abuse websites and chat rooms where, among other things, he obtained images of child sexual abuse. B.S. testified that [Mr.] Skaggs also had used her mother's computer to show B.S. videotapes of child sexual abuse. The videotapes were recovered from the mother's computer and admitted into evidence at trial, but they are

2

not in the record on appeal. The computer evidence spanned a 5-month period from August 25, 2004 through January 21, 2005.

. . . .

At trial in June 2007, [Mr.] Skaggs' defense included a general denial that he sexually assaulted B.S., and a general denial that he knowingly possessed the images and other evidence of child sexual abuse recovered from his computer. [Mr.] Skaggs suggested the obscene material was placed on his computer by hackers through the use of viruses or by acquaintances who knew his password and user name, franchise001. The jury convicted [Mr.] Skaggs on all but one aggravated criminal sodomy count.

*State v. Skaggs* ("*Skagg Direct Appeal*"), 212 P.3d 1039 (Table), 2009 WL 2436671

at *1 (Kan. Ct. App. 2009) (unpublished table decision).

B.S.'s testimony was explicit. When questioned about what kinds of sexual

acts Mr. Skaggs had her engage in, she said:

A. Stuff like him putting his mouth on my vagina.
Q. What were you doing while he was doing that?
A. Putting my mouth on his penis.
Q. Okay. And do you remember calling that a specific name?
A. 69.
Q. And when you say putting his mouth on your vagina . . . what was he actually doing?
A. He said it was called eating a person out and licking somebody's vagina.

R. at 440 n.18.

She also testified that Mr. Skaggs "would have her engage in sexually explicit

conversations with third parties on the Internet and view images on the computer of

adults engaged in sexual acts with children." *Skaggs Direct Appeal*, 2009 WL

2436671, at *11. At trial, the jury was shown "about 10 videotapes" of "older people

having sex with kids" *Id.* at *13. Mr. Skaggs obtained those videos from Daniel

Lafountain, who testified at trial regarding online communications that were

3

presented into evidence without objection. *Id.* at *12–13. In those communications, Mr. Skaggs told Mr. Lafountain that "last night was a good breakthrough . . . and a setback . . . we made out all night . . . and then she let me finger her, but after a bit, she started crying and said it hurt too bad . . . and asked if I would never do it again. . . . [S]o i am a bit stuck." R. at 460. Lafountain responded, "I don't have any 10yrold [sic] ones, just [] one of like late teens. I want to help this along! Cant [sic] wait:-D[.]" *Id.* To this, Skaggs replied, "I have got the oldest kinda curious . . . the movies worked well . . . do you have one with about a 10 year old or so [having sexual intercourse] that lasts for a bit . . . if i [sic] can show her that i [sic] think I've got her wrapped up." *Id.* at 460–61. And later added, "the vids you send will be helpful to her so she sees that it does happen, so she will feel good about it." *Id.* at 461.

Before the district court, Mr. Skaggs raised ten grounds for relief. The district court denied his petition and declined to grant him a COA on any of those grounds. We granted a COA on three issues and now address them on the merits.

## II. ANALYSIS

"[AEDPA] requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (quoting 28 U.S.C. § 2254(b)(1)(A)). When claims raised in a § 2254 petition are adjudicated on the merits in state court, "we may only grant relief if the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination

4

of the facts in light of the evidence presented in the State court proceeding.'" *Byrd v. Workman*, 645 F.3d 1159, 1166–67 (10th Cir. 2011) (internal citation omitted) (quoting 28 U.S.C. § 2254(d)(1), (d)(2)). For such claims, "AEDPA imposes a highly deferential standard for evaluating state-court rulings—one that demands that state-court decisions be given the benefit of the doubt, and that prohibits us from substituting our own judgment for that of the state court." *Ellis v. Raemisch*, 872 F.3d 1064, 1083 (10th Cir. 2017) (quotation marks omitted). For a state prisoner to obtain habeas relief, he "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). If that standard seems "difficult to meet, that is because it was meant to be." *Id.* at 102. "If, however, the state courts did not address the merits of the prisoner's federal claim, the federal habeas courts review the claim de novo." *Grissom v. Carpenter*, 902 F.3d 1265, 1272 (10th Cir. 2018) (quotation marks omitted).

As noted, Mr. Skaggs raises ten grounds for relief. We granted Mr. Skaggs a COA on three specific claims: (1) whether his attorney provided ineffective assistance of counsel when he failed to cross-examine the State's forensic expert using the finding from her report excluding Mr. Skaggs as a possible match to DNA in evidence, (2) whether a statement made by the prosecution to the jury amounted to misconduct, and (3) whether the cumulative effect of otherwise harmless or nonprejudicial federal constitutional errors deprived Mr. Skaggs of due process or a

fair trial. The government argues that we need not reach the merits of Mr. Skaggs's claims because his habeas petition was untimely. Beginning with the government's contention, we address each claim in turn.

## A. *Timeliness*

AEDPA imposes a one-year limitations period in which to file a habeas petition that runs from "the date on which the [state court] judgment became final," excluding "time during which a properly filed application for State post-conviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d). A petition filed outside of this legally defined period can nevertheless be timely if the petitioner shows that he is entitled to equitable tolling—"'that he has been pursuing his rights diligently, and . . . that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). It is undisputed that Mr. Skaggs filed his habeas petition outside of the legal limitations period. But the district court granted him equitable tolling, finding Mr. Skaggs "diligently pursued relief," his then-retained counsel's "egregious" "misconduct" prevented him from timely filing his petition, and that misconduct constituted an "extraordinary circumstance." Order Granting Equitable Tolling (Jun. 22, 2016) at 3.

The government encourages us to second-guess the district court by taking one sentence of the order out of context. In its order granting equitable tolling, the district court noted that Mr. Skaggs's then-retained counsel had "mistakenly determined the filing deadline" for the petition. *Id.* at 2. But this was not the finding of fact on which

6

the district court based its decision to grant equitable tolling. It concluded that the attorney's misconduct, not the miscalculation, prevented Mr. Skaggs from timely filing his petition. The government's insistence that we conclude otherwise is, in essence, a challenge to the district court's fact finding. We usually review the "factual findings underlying [a] legal conclusion"—a legal conclusion like the applicability of equitable tolling—under the "clear-error standard." *See United States v. Nixon*, 919 F.3d 1265, 1269 (10th Cir. 2019). But the government made no argument that the district court's fact finding was clearly erroneous.

Without more, we decline the government's invitation to affirm the district court's denial of relief on the alternative ground that Mr. Skaggs's petition is untimely.

## B. *Ineffective Assistance of Counsel*

To establish his ineffective assistance of counsel claim, Mr. Skaggs must show that his attorney's performance was deficient and that he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Performance is deficient when "counsel's representation f[alls] below an objective standard of reasonableness." *Id.* at 687–88. A "[m]ore specific guideline[] [is] not appropriate" and "[j]udicial scrutiny of counsel's performance must be highly deferential," entertaining "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and avoiding "the distorting effects of hindsight." *Id.* at 688–89; *see also Harrington*, 562 U.S. at 105 ("Surmounting *Strickland's* high bar is never an easy task. . . . [T]he *Strickland* standard must be

7

applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.") (internal quotation marks omitted)).

But when the deferential *Strickland* standard is overlaid with § 2254, our review is "doubly deferential." *Byrd*, 645 F.3d at 1168 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Grant v. Royal*, 886 F.3d 874, 903–04 (10th Cir. 2018) (quoting *Harrington*, 562 U.S. at 105), *cert. denied sub nom. Grant v. Carpenter*, 139 S. Ct. 925 (Jan. 14, 2019). "And because the *Strickland* standard is a general standard, a state court has more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* at 904 (quotation marks omitted). "In other words, when assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas review, we defer to the state court's determination that counsel's performance was not deficient and, further, defer to the attorney's decision in how to best represent a client." *Byrd*, 645 F.3d at 1168 (quotation marks omitted).

As for prejudice, Mr. Skaggs "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood

of a different result must be substantial, not just conceivable," *Harrington*, 562 U.S. at 112, but "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case," *Strickland*, 466 U.S. at 693; *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002).

Included in the evidence at trial was the underwear B.S. wore during her stay with Mr. Skaggs. When lab analysis of the underwear was performed, amylase—an enzyme found in bodily fluids, including urine and saliva—was discovered. The state's forensic expert, Dr. Barbara Swanson, issued a report of her analysis of the amylase, which was admitted in evidence, concluding that "the DNA found there matche[d] B.S.'s DNA profile" but did "not match [Mr.] Skaggs' DNA profile" and therefore Mr. Skaggs could "be excluded as a possible contributor of the [amylase]." *Skaggs v. State* ("*Skaggs Habeas*"), 321 P.3d 36, 2014 WL 1193324, at *7 (Kan. Ct. App. 2014) (unpublished table opinion). During Dr. Swanson's testimony at trial, the prosecution asked: The "[a]mylase result, saliva result, was that a strong result or a weak result? Do you know how much biological fluid that [a]mylase represented?" R. at 453. Dr. Swanson responded that she performed an "estimated quantification of how much [was] there" and that the amylase "was a concentration, more concentrated one to one solution, which can indicate saliva." *Id.* She further testified that she found "only one source of DNA" in the amylase and, although it was "possible that someone else's DNA was in the amylase," "there were not enough skin cells present to obtain a DNA profile to identify its contributor." *Skaggs Habeas*, 2014 WL 1193324, at *7.

9

Mr. Skaggs claims his counsel performed deficiently when he failed to adequately cross-examine Dr. Swanson to "challenge [her] testimony . . . with her previous testimony that she did in fact get a single source profile" or with her report that excluded Mr. Skaggs as a "possible contributor" of the amylase. Pet'r's Br. at 4–5. The state court rejected this claim. It determined that Mr. Skaggs's attorney adequately cross-examined Dr. Swanson because the cross-examination "established that amylase can be attributed to a number of nonsexual bodily fluids other than saliva." *See Skaggs Habeas*, 2014 WL 1193324, at *9. Because Dr. Swanson's "report conclusively eliminated Skaggs as a contributor to the amylase," the state court explained, any additional testimony by a defense expert "would have been cumulative." *Id.* at *8. Mr. Skaggs rejects that explanation, arguing that "there is no way to know if the jury actually read or understood the results quoted in the four-page report." Pet'r's Br. at 5. But the state court determined that Dr. Swanson's testimony implied the report's conclusion: the amylase featured only one source profile, the source profile was consistent with B.S., and B.S.'s DNA "would naturally be in her own panties in the form of vaginal secretions and skin cells," implying that the single source of the amylase was B.S. *See Skaggs Habeas*, 2014 WL 1193324, at *7.

The district court found "the [state court's] analysis consistent with the *Strickland* standard." R. at 447. But even given the "doubly deferential" standard applicable here, *see Byrd*, 645 F.3d at 1168, we cannot agree. We see neither a strategic advantage nor an objectively reasonable rationale for failing to challenge

10

Dr. Swanson on cross-examination with her report excluding Mr. Skaggs "as a possible contributor of the [amylase]." *Skaggs Habeas*, 2014 WL 1193324, at *7. But that does not mean Mr. Skaggs is entitled to habeas relief.

Mr. Skaggs cannot show that his attorney's deficient performance prejudiced him. Although neither the state court nor the district court addressed prejudice (and even though the government did not argue it), we are free to affirm the district court "on any basis supported by the record." *Newmiller v. Raemisch*, 877 F.3d 1178, 1194 (10th Cir. 2017) (quotation marks omitted). Because the state court did not address prejudice on the merits, we review it de novo. *Grissom*, 902 F.3d at 1272 ("If, however, the state courts did not address the merits of the prisoner's federal claim, the federal habeas courts review the claim de novo." (quotation marks omitted)).

First, the fact that Dr. Swanson could identify only B.S. as a source of the amylase does not disprove the allegations of abuse. Second, we conclude, as the state court did elsewhere, that "the evidence at trial against [Mr.] Skaggs was overwhelming." *Skaggs Habeas*, 2014 WL 1193324, at *11. The jury was presented not only with B.S.'s testimony of abuse, but with chat logs, shown to have been written by Mr. Skaggs, that corroborated her testimony. Further, B.S.'s testimony about the videos Mr. Skaggs showed her was corroborated by the discovery of such videos. Thus, even if Mr. Skaggs's attorney had not performed deficiently, there is no "reasonable probability that . . . the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694.

We therefore deny Mr. Skaggs's ineffective assistance of counsel claim.

11

## C. *Prosecutorial Misconduct*

A prosecutor's improper comments violate a defendant's due process rights where they "infect[] the trial with unfairness." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "The test for whether a defendant's trial was fundamentally unfair based on a prosecutor's comments proceeds in two steps: (1) the court first decides whether the prosecutor's comments were improper, and (2) if so, it examines their likely effect on the jury's verdict." *United States v. Christy*, 916 F.3d 814, 824 (10th Cir. 2019). If the prosecutor's comments were both improper and inhibited "the jury's ability to judge the evidence fairly," the misconduct deprives the defendant of his right to due process. *See Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotation marks omitted).

Mr. Skaggs roots his prosecutorial misconduct claim in the prosecutor's statements made during closing argument. The prosecutor stated:

> What was found in that underwear [B.S.] was wearing on January the 21st, 2005, the enzyme [a]mylase. You heard [Dr.] Swanson testify that the enzyme [a]mylase was found in high concentration in human saliva. Does it make sense you might find [a]mylase on her underwear? You heard her testimony, you heard her interview with numerous accounts she gave that the defendant was performing oral sex on her . . . . And so is it any surprise that [a]mylase was found in her underwear?

*Skaggs Habeas*, 2014 WL 1193324, at *8.

Mr. Skaggs argues the prosecutor's implication that the amylase stain in B.S.'s underwear contained his saliva deprived him of his due process rights. The state court acknowledged that "[t]he prosecutor's argument strayed close to the edge of what would be a reasonable inference from the evidence," but concluded that "there was a

12

modicum of evidence to support it." *Skaggs Habeas*, 2014 WL 1193324, at *9.

Apparently accepting the characterization of the prosecution's argument as

"[t]hreading th[e] evidentiary needle," *see id.*, the district court agreed that "there

was evidence to support the prosecutor's argument—amylase has many different

sources, including saliva, . . . B.S. testified that [Mr.] Skaggs performed oral sex on

her," and Dr. Swanson's testimony left open the possibility that the amylase could

contain Mr. Skaggs's DNA, "but too few of [Mr.] Skaggs' cells existed in the sample

[Dr.] Swanson tested." R. at 454. This accords with the state court's conclusion on

direct appeal, that it saw "nothing improper with the prosecutor's . . . argument based

on the evidence." *Skaggs Direct Appeal*, 2009 WL 2436671, at *3.

Because we believe the jury could judge the evidence fairly, we need not (and

do not) decide whether the prosecutor's closing argument was improper. *Cf. Byrd*,

645 F.3d at 1168 (noting that "[c]ourts are free to address the[] two prongs [of

*Strickland*] in any order"); *see also Christy*, 916 F.3d at 825 (acknowledging that a

court may "assume[] the prosecutor made an improper comment"). To determine

whether a jury had the "ability to judge the evidence fairly," *Fero*, 39 F.3d at 1474

(quotation marks omitted), we "consider the trial as a whole, including the curative

acts of the district court, the extent of the misconduct, and the role of the misconduct

within the case." *Christy*, 916 F.3d at 826. As with the ineffective assistance of

counsel claim, above, the state court did not reach prejudice on the merits, so we

consider the prejudicial effects of the prosecutor's closing argument de novo.

*Grissom*, 902 F.3d at 1272.

13

Even assuming the prosecutor's closing argument was improper and even considering prejudice de novo, when weighed "against the weight of the evidence" presented at trial, *id.* at 835—B.S.'s testimony, the chat logs' corroboration of B.S.'s testimony, Mr. Lafountain's testimony, and so on—the prosecutor's closing argument did not "prejudice[] the jury," *id.*, or impair its ability to fairly judge the evidence before it. As discussed, the fact that only one source of the amylase could be identified does not exonerate Mr. Skaggs. And the prosecution's argument amounts to a proverbial drop in the bucket compared to the sea of evidence against Mr. Skaggs. He therefore cannot show that the prosecutor's comments, improper or not, denied him due process.

Thus, we deny Mr. Skaggs's prosecutorial misconduct claim.

### D. *Cumulative Error*

"Under cumulative error review, a court merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Jackson v. Warrior*, 805 F.3d 940, 955 (10th Cir. 2015) (quotation marks omitted). "Cumulative-error analysis is an extension of the harmless-error rule[] and is determined by conducting the same inquiry as for individual error." *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003) (quotation marks omitted). Thus, we apply the harmless error standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993)—whether the errors had a substantial and injurious effect or influence in determining the jury's verdict—to the multiple errors found. *See*

14

*Underwood v. Royal*, 894 F.3d 1154, 1186 (10th Cir. 2018), *cert. denied sub nom. Underwood v. Carpenter*, 139 S. Ct. 1342 (2019). But "cumulative-error in the federal habeas context applies only where there are two or more actual constitutional errors." *Jackson*, 805 F.3d at 955 (quotation marks omitted).

The state court did not note any specific errors and concluded that any "minor deficiencies in [Mr.] Skaggs's attorney's performance found here when viewed collectively did not substantially prejudice [Mr.] Skaggs." *Skaggs Habeas*, 2014 WL 1193324, at *11. Because the district court did not find "multiple errors," it also denied Mr. Skaggs's cumulative error claim. R. at 462; s*ee also Jackson*, 805 F.3d at 955. Unlike the state and district courts, we have found or assumed two harmless errors. When a state court does not perform a cumulative error analysis or performs one considering errors other than the "precise errors" before us on appeal, we perform our cumulative error analysis de novo. *Grant*, 886 F.3d at 955.

Even aggregated, the errors here are harmless. Had the government withheld the DNA evidence completely or—even more favorable for Mr. Skaggs—conceded that there was no DNA evidence linking Mr. Skaggs to the crimes, the jury would have reached the same result. In the face of such overwhelming evidence of guilt, the errors exerted no more than a negligible influence on the jury's verdict, well short of the substantial and injurious influence required by *Brecht*.

We therefore deny Mr. Skaggs's cumulative error claim.

15

### III. CONCLUSION

For the reasons stated, we affirm the district court's denial of habeas relief.

Entered for the Court


Carolyn B. McHugh
Circuit Judge